Jack **RHEUARK**

v.

Bill **SHAW**, Paul T. Bastas, Don Metcalf, John Whittington, David Pickett, Jim Jackson, Jim Tyson, Roy Orr, and County of Dallas.

John **DOESCHER**

v.

Paul T. **BASTAS**, Don Metcalf, John Whittington, David Pickett, Jim Jackson, Jim Tyson, Roy Orr, and the County of Dallas.

Robert Allen **JORDAN**

v.

Paul T. **BASTAS**, Hon. Don Metcalf, John H. Whittington, David Pickett, Jim Jackson, Jim Tyson, Roy Orr, and County of Dallas.

Nos. CA3–76–171–F, CA3–76–1336–F and CA3–77–444–F.

United States District Court, N. D. Texas, Dallas Division.

July 3, 1979.

On Award of Attorney Fees Aug. 31, 1979.

---

900

Vincent W. Perini and Elizabeth Unger Carlyle, Dallas, Tex., for plaintiff Rheuark.

Tedford E. Kimbell and Janet L. Babcock, Allen, Knuths, Cassell & Short, Dallas, Tex., for plaintiff Doescher.

Molly Steele Bishop, Thompson & Knight, Dallas, Tex., for plaintiff Jordan.

John B. Tolle, Gerald A. Banks, Sue La-Garde, Asst. Dist. Attys., Dallas, Tex., for all defendants.

## MEMORANDUM OPINION

ROBERT W. PORTER, District Judge.

Doescher, Jordan and Rheuark were convicted in the Texas state courts of various criminal offenses. They each sought to appeal their convictions to the Texas Court of Criminal Appeals, but it took between nine and twenty-three months for the transcription of the court proceedings to be prepared by the court reporter. Each Plaintiff alleges that these delays violated their constitutional rights to speedy appeal and due process, and that they are entitled to damages and injunctive relief under 42 U.S.C. § 1983. The court, in summary, holds:

(1) The delays in this case violated Plaintiffs' constitutional due process rights on appeal, for which Rheuark and Doescher are each entitled to $1.00 as nominal damages and Jordan is entitled to $3,000 actual damages, but they are not entitled to any injunctive relief or punitive damages;

(2) Judge Metcalf is judicially immune for his judicial acts which caused Plaintiffs' injuries;

(3) Absolute legislative immunity appeals to local government officials performing legislative acts and the Dallas County Commissioners are entitled to legislative immunity for their legislative acts which caused Plaintiffs' injuries;

(4) Dallas County is liable for damages and attorneys' fees because the actions of the Commissioners constituted a policy and custom of Dallas County that violated Plaintiffs' rights;

(5) Court reporters are entitled to greater qualified immunity than state executive officials, and Bastas is entitled to qualified immunity for his acts which caused Plaintiffs' injuries; and

(6) Under 42 U.S.C. § 1988 attorneys fees are taxed as costs, and in this case are taxed as such against judges, legislators and court reporters in their official capacities despite claims of absolute judicial and legislative immunity, and claims of qualified immunity for court reporters.

John Doescher was convicted of aggravated robbery on March 12, 1975 in Criminal District Court No. 2 in Dallas, Texas, and on March 20, 1975 the trial judge sentenced him to 75 years in prison. Doescher filed a timely notice of appeal on April 11, 1975 by filing a pauper's oath in which he requested the trial judge to appoint an attorney to represent him on appeal and to order the court reporter to prepare a statement of facts free of charge.

The statement of facts was completed on December 6, 1976 and Doescher's conviction was affirmed by the Texas Court of Criminal Appeals on September 27, 1978. Doescher's motion for rehearing was denied on March 21, 1979. The time that elapsed between ordering his statement of facts to be prepared and the actual preparation of the statement of facts was 20 months.[1]

---

1. The record on appeal in the Texas Court of Criminal Appeals contains two things: a "transcript" containing all of the pleadings, motions and other papers in the case, and a transcription of the court reporter's notes taken at the trial, called a "statement of facts".

Robert Allen Jordan was convicted of carrying a prohibited weapon in a tavern on October 5, 1976 in Criminal District Court No. 2 in Dallas, Texas, and on October 22, 1976 the trial judge sentenced him to 12 years in prison and a $3,000.00 fine. Jordan gave a timely notice of appeal on October 22, 1976 and the trial judge then ordered the court reporter to prepare a statement of facts covering the proceedings in Jordan's trial.

The statement of facts was completed on July 22, 1977. Jordan's conviction was reversed and remanded by the Texas Court of Criminal Appeals for a new trial. On April 20, 1978, Jordan entered a plea of guilty to the charge and received a sentence of three years, with credit for time served since March 8, 1976. Jordan was released from the Texas Department of Corrections on May 1, 1978.

The time that elapsed between ordering his statement of facts to be prepared and the actual preparation of the statement of facts was nine months.[2]

Jack Rheuark was convicted of armed robbery in January, 1975 in Criminal District Court No. 2 in Dallas, Texas, and on February 10, 1975 the trial judge sentenced him to 99 years in prison. Rheuark filed a timely notice of appeal on February 10, 1975 and the trial judge then ordered the court reporter to prepare a statement of facts concerning the proceedings in Rheuark's trial.

Rheuark's statement of facts was completed on January 21, 1977. Rheuark's conviction was affirmed by the Texas Court of Criminal Appeals.

The time that elapsed between ordering the statement of facts to be prepared and the actual preparation of the statement of facts was 23 months, 11 days.[3]

## RHEUARK'S PRO SE REPRESENTATION

Plaintiff Rheuark in certain pro se petitions and at a hearing on February 21, 1979, expressed some dissatisfaction with the attorney's representation alleging that his court appointed counsel had not raised a claim under 42 U.S.C. § 1985 and had failed to subpoena certain witnesses. The court advised the Plaintiff that he had no right to counsel in a 1983 action, and that he could represent himself.

You have a right to represent yourself [4] or you have a right to be represented by counsel [5], but you can't have some of each.[6] You go one way or the other and that's clearly the law when there is an attorney at record in the case . . .
You are represented by highly competent counsel particularly in this field . . .
but I want you to tell me what you wish to do.

Hearing February 21, 1979 at 5–6

The Court also stated "(i)f the evidence raised the issue of conspiracy . . . I

2. The pretrial order indicates that only plaintiffs Rheuark and Doescher claimed that the County of Dallas, through its governing body, the Dallas County Commissioners Court, had deprived them of due process by failing to provide plaintiffs with a statement of facts within a reasonable time. Plaintiff Jordan, on pages 1 and 2 of Jordan's third amended complaint filed November 7, 1978, also complains about the County of Dallas, and I consider the County of Dallas to be sued by all three plaintiffs.

3. In his original complaint Rheuark complained of certain actions by the Dallas County Clerk, Bill Shaw. Rheuark's final amended complaint does not name Bill Shaw as a defendant, and the parties have stipulated that District Clerk Bill Shaw prepared the transcript in each of these cases without delay once he was furnished with Rheuark's statement of facts.

4. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); *Lee v. Alabama*, 406 F.2d 466 (5th Cir. 1968), cert. den'd, 395 U.S. 927, 89 S.Ct. 1787, 23 L.Ed.2d 246 (1969); 28 U.S.C. § 1654. The right is somewhat limited. See *Price v. Johnston*, 334 U.S. 266, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948) (prisoner has no absolute right to be present to argue his own appeal at oral argument).

5. 28 U.S.C. § 1654.

6. *United States v. Daniels*, 572 F.2d 535 (5th Cir. 1978); *United States v. Hill*, 526 F.2d 1019 (10th Cir. 1975), cert. den'd, 425 U.S. 940, 96 S.Ct. 1676, 48 L.Ed.2d 182 (1976); *United States v. Shea*, 508 F.2d 82 (5th Cir. 1975), cert. den'd, 423 U.S. 847, 96 S.Ct. 87, 46 L.Ed.2d 69 (1975); 28 U.S.C. § 1654.

would likely grant a trial amendment to . . . let the pleadings conform with the evidence." Hearing February 21, 1979 at 7–8.

Plaintiff Rheuark then elected to proceed to trial represented by counsel. The evidence presented at trial raised the issue of a conspiracy, and therefore the Court permits Plaintiff Rheuark to amend his complaint by including a conspiracy claim under 42 U.S.C. § 1985(2) and (3) that he was denied equal protection of the laws by his failure to receive a speedy appeal.

## EXHAUSTION OF STATE REMEDIES

■ A petitioner must exhaust his state remedies in a § 1983 or a § 1985 civil suit for damages where the damage is related to the underlying criminal conviction and when he seeks injunctive relief under 42 U.S.C. § 1983. 42 U.S.C. § 1983; 42 U.S.C. § 1985; *Fulford v. Klein*, 529 F.2d 377 (5th Cir. 1976) *aff'd en banc*, 550 F.2d 342 (5th Cir. 1977); *Gaito v. Ellenbogen*, 425 F.2d 845 (3rd Cir. 1970). Exhaustion of state remedies is not required where the federal suit is independent of any habeas allegations. *Id.*

Doescher has exhausted his state remedies. He filed pro se briefs with the Texas Court of Criminal Appeals contending that he had been denied his right to a speedy appeal. The Texas Court of Criminal Appeals considered his arguments and concluded:

"We have reviewed appellant's pro se supplemental briefs and have concluded that their consideration would add nothing to the jurisprudence of this state and they are hereby overruled."

7. A petitioner has exhausted his state remedies if the issue is raised in the prisoner's brief to the state appellate court, even if the state court appellate opinion fails to refer to that constitutional claim. *Smith v. Digmon*, 434 U.S. 332, 98 S.Ct. 597, 54 L.Ed.2d 582 (1978).

8. Exhaustion is not required when state procedures do not afford swift vindication of constitutional errors. *Bartone v. United States*, 375 U.S. 52, 54, 84 S.Ct. 21, 11 L.Ed.2d 11 (1963); *Galtieri v. Wainwright*, 582 F.2d 348, 354, fn. 12 (1978). Federal courts do not require exhaustion when the state courts' substantive hold-

*Doescher v. State*, 578 S.W.2d 385 (Tex. Crim.App.1978).

■ Doescher's motion for rehearing was denied March 21, 1979.[7]

Jordan has exhausted his state remedies because his conviction was overturned by the Texas Court of Criminal Appeals, and he subsequently pled guilty to time served and was released from prison on May 1, 1978.

Rheuark has technically not exhausted his state court remedies. Although Rheuark did raise the denial of his statement of facts in a successful attempt to avoid the exhaustion requirement before he received his statement of facts, *see Rheuark v. Wade*, 540 F.2d 1282 (5th Cir. 1976), he has apparently never alleged before a state or federal court that such denial entitled him to any habeas corpus relief other than receipt of his statement of facts. Rheuark has received his statement of facts.

■ Exhaustion of state remedies is not required when a petitioner seeks damages and injunctive relief against state court officials for their alleged failure to forward a state trial court transcript to the State Appellate Court if the petitioners are not seeking relief from their sentences, 42 U.S.C. § 1983; *Rheuark v. Shaw*, 547 F.2d 1257 (5th Cir. 1977)[8], and therefore Doescher, Jordan and Rheuark are not required to exhaust their state remedies.

## SIXTH AMENDMENT RIGHT TO SPEEDY APPEAL

■ The Sixth Amendment to the Constitution guarantees that "(i)n all criminal

ings of federal law indicate exhaustion would be futile. *Blackledge v. Perry*, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974); *Galtieri v. Wainwright*, 582 F.2d 348, 355, fn. 13 (5th Cir. 1978).

Plaintiffs' complaints attack the constitutionality of extraordinary delays in preparing their appellate statements of fact, a claim which has been rejected by the Texas Court of Criminal Appeals. Undue delay by the state in treating prisoner's petition obviates the need for exhaustion. *Galtieri v. Wainwright*, supra.

prosecutions, the accused shall enjoy the right to a speedy and public trial . . ." U.S.Const. Amendment VI. The right to a speedy trial extends to the sentencing of a defendant and an unreasonable delay may constitute a violation of the Sixth Amendment. *Pollard v. United States*, 352 U.S. 354, 77 S.Ct. 481, 1 L.Ed.2d 393 (1957); *United States v. Campbell*, 531 F.2d 1333 (5th Cir. 1976); *United States v. James*, 459 F.2d 443 (5th Cir. 1972).

An early Supreme Court decision held that an appeal from a state judgment of conviction was not a matter of right, and was not a necessary element of due process. *McKane v. Durston*, 153 U.S. 684, 14 S.Ct. 913, 38 L.Ed. 867 (1894). This decision was followed in *Griffin v. Illinois*, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1953), and *Ortwein v. Schwab*, 410 U.S. 656, 93 S.Ct. 1172, 35 L.Ed.2d 572 (1973).

■ The word "trial" in the Sixth Amendment does not include an appeal, but rather refers to a determination by the jury of guilt or innocence. *Colunga v. State*, 527 S.W.2d 285 (Tex.Crim.App.1975); *Zanders v. State*, 515 S.W.2d 907 (Tex.Crim.App. 1974); *Cunningham v. State*, 484 S.W.2d 906 (Tex.Crim.App.1972); *State v. Lagerquist*, 254 S.C. 501, 176 S.E.2d 141 (1970), *cert. den'd* 401 U.S. 937, 91 S.Ct. 912, 28 L.Ed.2d 216 (1971); *State ex rel. Mastrian v. Tahash*, 277 Minn. 309, 152 N.W.2d 786 (1967). There is no Sixth Amendment right to speedy appeal. *Doescher v. Estelle*, 454 F.Supp. 943 (N.D.Tex.1978).

### DUE PROCESS RIGHT TO SPEEDY APPEAL

■ Substantial delay in processing of an appeal may constitute a denial of due proc-

ess. *Doescher v. Estelle*, 454 F.Supp. 943 (N.D.Tex.1978).[9] The Fifth Circuit has previously held in this case that Rheuark stated a cause of action under 42 U.S.C. § 1983 by claiming that his constitutional rights were violated by the delay in obtaining the transcript of the reporter's notes of his trial. *Rheuark v. Shaw*, 547 F.2d 1257 (5th Cir. 1977). Other courts have allowed similar causes of action. *McLallen v. Henderson*, 492 F.2d 1298 (8th Cir. 1974); *Washington v. Official Court Stenographer*, 251 F.Supp. 945 (E.D.Pa.1966); *Simmons v. Maslynsky*, 45 F.R.D. 127 (E.D.Pa.1968).[10]

■ All persons are entitled to "meaningful access to the courts", *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), including the right to a "meaningful" appeal where there is an established appellate process. *Douglas v. California*, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963).

"(A) state is not required by the Federal Constitution to provide appellate courts . . ." but when an appeal is provided, as it is in Texas, it must meet the requirements of due process and equal protection. *Griffin v. Illinois*, 351 U.S. 12, 18, 76 S.Ct. 585, 590, 100 L.Ed. 891 (1956); *See Douglas v. California*, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963); *Pate v. Holman*, 341 F.2d 764, 773, fn. 10 (5th Cir. 1965); *Doescher v. Estelle, supra.*

■ A court must consider four factors in determining whether or not a delay in processing a prisoner's appeal amounts to a denial of due process:

(1) Length of the delay;

9. *Smith v. State of Kansas*, 356 F.2d 654 (10th Cir. 1966), cert. den'd, 389 U.S. 871, 88 S.Ct. 154, 19 L.Ed.2d 151 (1967); *Rivera v. Concepion*, 469 F.2d 17 (1st Cir. 1972); *United States v. Massimo*, 432 F.2d 324 (2nd Cir. 1970); *United States v. Cifarelli*, 401 F.2d 512 (2nd Cir. 1968); *Tramel v. State of Idaho*, 459 F.2d 57 (10th Cir. 1972); *Colunga v. State*, 527 S.W.2d 285 (Tex.Crim.App.1975); *Zanders v. State*, 515 S.W.2d 907 (Tex.Crim.App.1974); *Cunningham v. State*, 484 S.W.2d 906 (Tex.Crim.App.1972); *State v. Lagerquist*, 254 S.C. 501,

176 S.E.2d 141 (1970), cert. den'd, 401 U.S. 937, 91 S.Ct. 912, 28 L.Ed.2d 216 (1971).

10. See also, *Slavin v. Curry*, 574 F.2d 1256 (5th Cir. 1978) (failure to mail papers prepared by a prisoner to state court); *Stiltner v. Rhay*, 322 F.2d 314 (9th Cir. 1963), cert. den'd, 376 U.S. 920, 84 S.Ct. 678, 11 L.Ed.2d 615 (1964); *Jenks v. Henys*, 378 F.2d 334 (9th Cir. 1967); *DeWitt v. Pail*, 366 F.2d 682 (9th Cir. 1966) (claimed confiscation by prison officials of transcript and other legal papers state a cause of action); *Qualls v. Shaw*, 535 F.2d 318 (5th Cir. 1976).

(2) The reason or justification for the delay;

(3) Whether and to what extent the defendant demanded a more rapid appeal; and

(4) Any prejudice resulting to the defendant by the delay (such as post trial confinement, worry and the desire to limit the possibility that the defendant's appeal will be impaired).

*Doescher v. Estelle, supra.*

These four factors are similar to those the court must consider in determining whether or not there has been a violation of a defendant's right to speedy trial under the Sixth Amendment. *See Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

None of these four factors is a necessary or sufficient condition to the finding that a delay in processing an appeal amounts to a denial of due process. "Rather, they are [relevant] factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process." *Barker v. Wingo, supra* at 533, 92 S.Ct. at 2193.

### Demand For Rapid Appeal/Length of Delay/Prejudice

Texas law has provided since at least 1965 that the transcription of a criminal proceeding should be completed within 90 days of the filing of the notice of appeal with the trial court. Tex.Code Crim.Proc. Art. 40.09, § 3. Until May 25, 1977, the trial court had the power to extend "for as many times as deemed necessary the time for preparation and filing of the transcription . . . and the transcription so filed shall be construed as having been filed within the time required by law." *Id.*[11]

Doescher never requested an extension of time in which to file his transcript, and the trial court never extended the time for preparation and filing of the transcription. Doescher made numerous requests through his attorney and directly to the trial judge to obtain a statement of facts, and requested members of his family to write letters on his behalf. When these efforts failed, he sought to represent himself on appeal, hoping that in that capacity he might secure his transcript more quickly. Despite these efforts, 20 months passed between the filing of Doescher's notice of appeal and his receipt of his statement of facts.

Jordan also sent numerous letters to judges and other court personnel to secure his statement of facts. Jordan wrote to the Texas Court of Criminal Appeals, but despite all of these efforts it took nine months for Jordan to receive his statement of facts.

■ Rheuark filed numerous habeas petitions including petitions to the Dallas state district courts, the Texas Supreme Court, the Texas Court of Criminal Appeals, a Federal District Court in Kansas, and a Federal Court in the Northern District of Texas seeking a statement of facts and an appellate review of his conviction. These courts either ignored his pleas, responded by claiming a lack of jurisdiction, or explained that the courts were unable to expedite the transcription of Rheuark's trial. Rheuark's herculean efforts secured a transcript of his trial 23 months, 11 days after he filed his notice of appeal.[12]

---

11. After May 25, 1977, the statute was amended to transfer from the trial court to the Texas Court of Criminal Appeals jurisdiction for granting extensions of time.

"16. Extensions of Time.

Extensions of time for meeting the limits prescribed in Sections 3, 6, 9 and 10 of this article for either the appellate or the state, may be granted by the Court of Criminal Appeals or a judge of the Court for good cause shown on timely application to the Court of Criminal Appeals." Tex.Code Crim.Pro., Art. 40.09(16).

12. The parties have stipulated that each of the plaintiffs and their court appointed attorneys never lacked diligence in pursuing all aspects of their appeals. A court need not make a finding of actual prejudice in order to find a denial of due process on appeal, though it must consider possible prejudice to the Defendant, the length and reasons for the delay, and whether and to what extent the Defendant demanded a speedy appeal. *Doescher v. Estelle,* 454 F.Supp. 943, 950–51 (N.D.Tex.1978).

Prejudice is certainly present in this case. Jordan had his conviction reversed and could

### Reasons for the Delay

When Judge Metcalf assumed the bench of Criminal District Court No. 2 on January 1, 1973, there was a backlog of appeals which had not been transcribed by Paul Bastas, his court reporter. Judge Metcalf and Bastas discussed the situation in the summer of 1973, and the court conducted an informal audit in the fall of that year which uncovered between 30 and 35 previously unknown appeals. By the end of 1973, according to Judge Metcalf, the court had a rough understanding of the magnitude of the problem.

As the official court reporter for Criminal District Court No. 2, Bastas had a duty to attend all sessions of the court and take full shorthand notes of all oral testimony offered. V.A.T.S. Art. 2324. When a party to any suit reported by Bastas requested a statement of facts, Bastas was required to make up the statement of facts. *Id.* Bastas could only work on preparing these statements of the evidence when he was not in the courtroom. Judge Metcalf held one or two trials per week, and in addition heard guilty pleas and held probation revocation hearings, so it was necessary to employ a substitute court reporter to free Bastas to transcribe cases on appeal.

■ Defendants argue that the backlog of appeals occasioned by confusion in the previous judge's filing system and the State District Clerk's office caused the delay that Plaintiffs experienced in receiving their transcripts. Defendants argue that this type of docket congestion should justify the delays in preparing Plaintiffs' statements of the facts.

Docket control problems, which are not within a criminal defendant's control, cannot justify inordinate delays of nine

months, twenty months and twenty-three months in preparing the transcript of the reporter's notes, particularly where the court could remedy the problem by hiring additional court reporters to reduce the backlog.

Judge Metcalf was aware of the problems in the fall of 1973 and did hire substitute court reporters three months out of the year of 1973 and four months out of the year in succeeding years to assist Bastas in reducing the backlog and to fill in when Bastas was sick or on vacation.[13] This did not substantially alleviate the backlog, and finally in late 1976, Judge Metcalf hired a substitute reporter for nearly a year to free Bastas from his daily in-court reporting duties and permit him sufficient time to catch up on his appeals. Judge Metcalf had the authority to appoint additional court reporters, and the backlog would have been alleviated by the end of 1974 if he had had two court reporters beginning in early 1973.

■ Delays of nine, twenty, and twenty-three months in preparing the transcripts of the reporter's notes violate constitutional due process and the constitutional commitment to speedy justice for all. U.S. Const. Art. 14.

### ACTIONS BY EACH DEFENDANT

#### Paul Bastas

Paul Bastas has been the official court reporter in Criminal District Court No. 2 for almost twenty years, including a number of years before Judge Metcalf assumed the bench. Bastas was directly responsible for the preparation of the statements of facts for Doescher's, Jordan's, and Rheuark's trials and he was ordered by Judge Metcalf in each case to prepare a statement of facts.

---

have been released earlier. Doescher has been delayed in seeking his habeas remedies which may result in his release from prison, and all three plaintiffs have spent time in jail awaiting the outcomes of their appeals resulting in loss of job, disruption of family life and enforced idleness. The plaintiffs have enjoyed none of the freedom of movement and association enjoyed by a person who is free on bail pending disposition of his appeal.

**13.** Bastas testified that he took three to four weeks vacation per year, and averaged two weeks sick leave per year. During some of that time Judge Metcalf might take his vacation. A substitute reporter would be necessary if a visiting judge sat in Criminal District Court No. 2.

Bastas knew that the Code of Criminal Procedure contemplated that the statement of facts should be filed within 90 days after the filing of a notice of appeal, but for cases tried in 1975 he also knew that it took from 18 to 24 months for him to complete a statement of facts and that this delay caused a hardship on defendants.[14]

When Judge Metcalf assumed the bench Bastas was already running behind in his production of appellate factual transcripts, or statements of fact, and the addition of 30 to 35 additional appeals found as a result of Judge Metcalf's informal audit in the fall of 1973 compounded the backlog problem. Bastas, as an experienced court reporter, had the ability to project the length of time it would take him to catch up on the transcribing of his criminal trials, and how much additional court reporter assistance he would need to accomplish that goal. Bastas had a responsibility to impress upon the judge the enormity of the problem and the action that would be required to correct it, and he did not alert the court to the crisis.

This is particularly true in light of Bastas's extensive court reporting experience in Criminal District Court No. 2 prior to the time Judge Metcalf assumed the bench, and Judge Metcalf's limited familiarity in 1973 with the court's appellate backlog. Bastas also knew that at least one of the plaintiffs, Jack Rheuark, was very anxious to receive his statement of facts.

Although Bastas never specifically intended to deprive the Plaintiffs of their due process rights,[15] his failure to alert Judge Metcalf to the scope of the problem, and his failure to transcribe his appeals within the time prescribed by law was so likely to result in denying plaintiffs due process on appeal that it was substantially certain to occur. This deliberate inaction proximately caused violations of the Plaintiffs' rights under the Constitution.

*Judge Metcalf*

District judges are responsible for the appointment of official court reporters, and of deputy court reporters, when illness or disability of the official court reporter or the press of official work requires. V.A. T.S. Art. 2323. The trial judge must approve the record on appeal and, prior to May, 1977, the trial judge had the authority to grant extensions of time for preparing the statements of fact. Tex.Code Crim. Pro., Art. 40.09.

In late 1973 Judge Metcalf had a fair understanding of the backlog of appeals awaiting transcription in his court. Although Judge Metcalf hired substitute court reporters, they were only used in court four months each year in 1974–1976. The time lag in preparing appeals during this three year period was not reduced, and finally in late 1976 Judge Metcalf provided a substitute court reporter for Bastas for at least nine months to enable Bastas to dictate his appeals. Even then Judge Metcalf utilized Bastas to perform nonstatutory duties, including the preparation of criminal charges which took one to three hours per case.

Judge Metcalf had at his disposal the means to drastically reduce the backlog [16] but he did not fully utilize his power to appoint additional court reporters until nearly four years after he assumed the

---

**14.** Bastas testified that he knew of defendants who withdrew their appeals so that they could be transferred to the Texas Department of Corrections and be eligible for parole rather than wait for their statements of fact. When defendants become so frustrated with the lengthy delays in preparing the transcriptions of their cases that they withdraw their appeals, the judicial system has failed to provide those defendants due process on appeal.

**15.** Specific intent to deprive a plaintiff of his constitutional rights is not a necessary element of a cause of action under 42 U.S.C. § 1983. *Monroe v. Pape,* 365 U.S. 167, 187, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

**16.** Judge Metcalf could have easily determined the full extent of Bastas's backlog as early as 1973 if he had required, as Texas law contemplated, that attorneys request extensions of time to complete the transcript on appeal. Instead, Judge Metcalf had a policy of not requiring extensions because it was not the lawyer's fault that the transcript wasn't prepared.

bench and "when you talk about appeals . . . if the judge does not ride herd, so to speak, on that appeal nobody else does . . .". Rheuark Hearing at 44.[17]

Judge Metcalf's failure to monitor the problem closely, his tentative actions in 1973–1976 to cope with the problem, and his failure to fully assume his responsibility for insuring that trial proceedings were transcribed according to law are actions or failures to act which, although not intended to do harm to the Plaintiffs, were so likely to violate their due process rights and cause them injury that the harm is properly characterized as substantially certain to result.

Even though Judge Metcalf acted in a sincere belief that he was effectively handling the problem, he knew or should have known that his failure to "ride herd" and alleviate the backlog would violate the due process constitutional rights of the Plaintiffs. As early as 1972, one year before Judge Metcalf assumed the bench, the Texas Court of Criminal Appeals had warned trial judges that they were too lenient in granting extensions of time to court reporters to file transcripts. *Reese v. State*, 481 S.W.2d 841, 843 (Tex.Crim.App.1972). The same year the Texas Court of Criminal Appeals held that while there is no Sixth Amendment right to speedy appeal, a delay on appeal could amount to a denial of due process. *Cunningham v. State*, 484 S.W.2d 906 (Tex.Crim.App.1972). That result was echoed in later Texas decisions. *Zanders v. State*, 515 S.W.2d 907 (Tex.Crim.App.1974); *Colunga v. State*, 527 S.W. 285 (Tex.Crim. App.1975).[18] These clearly established Texas decisions made the failure of Judge Met-

calf, and the other defendants, to rapidly alleviate the backlog a violation of Plaintiffs' constitutional rights. Judge Metcalf's actions, or inactions, proximately caused the delays experienced by each Plaintiff.

### The Commissioners

The Commissioner's Court of Dallas County is the governing administrative body of Dallas County with the power and duty to decide on the county budget and make appropriations of funds.

The Commissioner's Court does not have the power to appoint extra court reporters or to refuse payment for their services, but the court does decide when those reporters will be paid. The Court has attempted to use this control over the mechanics of allocating payment to actively discourage the use of substitute court reporters.

The County Commissioners were aware of the problems the official court reporters were having with the appellate backlog and that extra court reporters were being used. One Commissioner testified that there had been a problem with the appeals since 1965, as long as he had been in office.[19] Some of the Commissioners also knew that appellate statements of fact took as long as two years to prepare and that over 50% of the requests for extra court reporters were to alleviate the appellate problem. They also knew or reasonably should have known that the Texas Court of Criminal Appeals had repeatedly held that delay in transcribing a transcript in a criminal case on appeal could amount to a constitutional denial of due process.

---

17. One of the reasons Judge Metcalf failed to appoint sufficient substitute reporters until 1976 was his conservative spending philosophy. "I have authority in [the] statute to get all the substitute reporters I need. As a practical matter, and I have tried to hold that to a minimum of—I guess because I'm basically a conservative person who doesn't like to be a free spender with the public's money." Rheuark hearing at 48.

While I would normally commend such fiscal restraint, the constitutional requirements of

due process on appeal may not be abridged by failing to fund substitute court reporters.

18. See "Appellate Delay in the Criminal Courts of Texas", 1974 Texas Bar Journal, 454 (May, 1974).

19. This testimony, as well as some of the documentary evidence in the testimony of other witnesses, leads me to the conclusion that Judge Metcalf's backlog was not unique or primarily a result of finding 30 to 35 previously undiscovered appeals.

Despite this knowledge, the Commissioners took the following actions:

(1) As early as the fall of 1975, the Commissioners had a discussion on the record concerning the payment of extra court reporters' bills. The Commissioners sought to restrict the judges to a specific yearly budget for court reporter services which could not be exceeded. They objected to the open ended nature of the district judges' requests and sent a letter to the judges asking them to curtail their appointment of additional court reporters.[20]

(2) The amount of the Commissioners' budget for extra court reporters was consistently exceeded in 1975, 1976 and 1977. In 1975 there was an overrun of $12,880.00, in 1976 an overrun of $8,048.06 and in 1977 an overrun of $48,819.94. Although it was the Commissioners' duty to investigate each appropriation, the Commissioners were aware that no specific district judge had responsibility for the court reporters account and there was no department head in charge of this line item of the budget. All of the Commissioners were aware that the extra court reporters were being used to deal with the problem of a backlog of appeals in the courts, but their only budgetary response to this problem was to severely limit appropriations for court reporters' services.

For example, in 1977, despite the overrun experienced in 1976 and despite the auditor's budget request for an additional budgeted amount of $13,000.00, the Commissioners Court appropriation for court reporters was the exact amount it had spent in 1976. Its failure to appropriate adequate funds, necessitating end of the year transfers from an unallocated reserve account to cover overruns, was an obvious attempt by the Commissioners to limit court reporter funding.

(3) The Commissioners' failure to adequately budget funds for court reporters also gave the Commissioners an opportunity at the end of the year to assert further financial pressure on the judges and reporters to limit the hiring of extra court reporters. When the budget for court reporters was exceeded, a request for payment was received by the auditor who would prepare a transfer of funds request to be heard by the Commissioners. The Commissioners could recall a number of instances where these payments to extra court reporters were held up, in some cases for over a month, because of the unwillingness of the Commissioners' Court to appropriate funds to pay these duly incurred obligations of the state district courts. These efforts clearly had a chilling effect on Judge Metcalf's use of extra court reporters. Judge Metcalf's court reporter testified that from 1970 to 1976 the Commissioners were continually objecting to requests for payment of substitute court reporters ". . . and the judge tried to be careful about not getting anybody too often so that he wouldn't get into any arguments with them . . . ." Hearing February 21, 1979, at 18.

(4) On December 8, 1976, the Commissioners wrote a letter to the judges of the courts of record of Dallas County requiring that the judges obtain prior approval from the Commissioners before appointing extra

---

**20.** On October 23, 1975, the Commissioners had the following discussion:

Mr. Pickett: I think maybe what we should do is place this account under the responsibility of the District Judges and just budget it, say 'this is your budget. You can't go over it next year'."

Mr. Jackson: We have already done that.

Mr. Orr: That's exactly what we have done.

Mr. Pickett: No, we didn't do that this year.

No, there is no one who has specific responsibility for this account. Am I correct, George?

Mr. Smith: That's correct.

\* \* \* \* \*

Mr. Pickett: But if we have one judge that's responsible for seeing that they stay within it, well I think we'll have better control next year.

Mr. Jackson: If we can get the judges to agree to do that, I think that's an excellent idea. But there is no enforcement power with that; that's the problem.

court reporters.[21] The letter was sent in an effort to reduce the expenditures for extra court reporters, although the Commissioners knew at the time they wrote the letter that they had no authority to require the judges to obtain advance clearance before hiring additional court reporters.

These actions by the Commissioners were intended to limit the expenditures for extra court reporters, an action which proximately caused delay in the preparation of Plaintiffs' statements of fact, constituting a violation of their constitutional rights of due process.[22] The Commissioners actions were so likely to produce this delay in preparing the appellate statements of fact that the harm to plaintiffs was substantially certain to occur. Finally, the Commissioners knew or reasonably should have known that their

---

**21.** The full text of the letter is as follows:

OFFICE OF THE
### COMMISSIONERS COURT
RECORDS BUILDING
DALLAS, TEXAS 75202
749–8361
December 8, 1976

TO: JUDGES OF ALL DALLAS COUNTY COURTS OF RECORD
FROM: COMMISSIONERS' COURT
RE: PAYMENT FOR EXTRA COURT REPORTER SERVICES

This letter is to advise you that payment will be made only for those extra court reporter services which have been obligated by official court action at this date.

In the future, prior approval of Commissioners' Court must be obtained prior to the securing of additional court reporter services.

Any questions concerning this action should be directed to this Court.

Cordially,

/s/ John Whittington, County Judge

/s/ Jim Jackson, Comm. Dist. #1 /s/ Jim Tyson, Comm. Dist. #3

/s/ David E. Pickett, Comm. Dist. #2 /s/ Roy Orr, Comm. Dist. #4

cc: Mr. Larry Murdoch
 Mr. George Smith

---

**22.** Defendants argue that proximate cause was not shown because the actions of the Commissioners had no effect on Judge Metcalf. Although Judge Metcalf testified that he received, the letter and he called the Commissioners' attorney, the judge stated that he was not going to clear his request for the court reporters with the Commissioners because they had no authority to order this type of prior approval. However, Judge Metcalf was concerned enough about the Commissioners' actions that he contacted County Judge Whittington and later wrote him a letter explaining that he anticipated a budget overrun in this area. Also, the judge's court reporter testified that the Commissioners' reluctance to adequately fund the court reporters did have an effect on Judge Metcalf prior to the Commissioners sending that letter.

actions in this regard would violate the constitutional rights of the plaintiffs and others.

*Dallas County*

 The Commissioners Court is the governing board of Dallas County and budget decisions by the Commissioners Court are official decisions of Dallas County. The Commissioners, and Dallas County, had a policy of attempting to curtail the budget for court reporters, a policy which was in conflict with the scope of their powers and which jeopardized the constitutional rights of these plaintiffs and others seeking appellate review of their convictions. This policy was a proximate cause of the delay experienced by these plaintiffs in obtaining their statements of fact, and Dallas County is liable for the implement of that policy.

"(W)hen execution of a government's policy or custom whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury . . . the government as an entity is responsible under section 1983."

*Monell v. New York City Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

### EQUAL PROTECTION CLAIMS

 Although a state is not required by the Federal Constitution to provide any appellate courts or any right to appellate review, ". . . that is not to say that a State that does grant appellate review can do so in a way that discriminates against some convicted defendants on account of their poverty." *Griffin v. Illinois,* 351 U.S. 12, 18, 76 S.Ct. 585, 590, 100 L.Ed. 891 (1956).[23]

"(O)nce a State establishes an appellate forum it must assure access to it upon terms and conditions equally applicable and available to all."

*Chaffin v. Stynchcombe,* 412 U.S. 17, 24 fn. 11, 93 S.Ct. 1977, 1981–1982 fn. 11, 36 L.Ed.2d 714 (1973).

In *Griffin,* the Supreme Court held that the State of Illinois did not have to purchase a stenographer's transcript for an indigent defendant, but other means had to be provided to assure the indigent defendant adequate and effective appellate review. The Supreme Court also held that California had to provide appellate assistance of counsel to indigents when California granted to all persons, rich or poor, an initial right of appeal to the California District Court of Appeals. *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963).

Substantial delay in processing an appeal may constitute a violation of the Equal Protection Clause of the Constitution. *State v. Lagerquist,* 254 S.C. 501, 176 S.E.2d 141 (1970), *cert. den'd,* 401 U.S. 937, 91 S.Ct. 912, 28 L.Ed.2d 216 (1971).

 The facts in this case, however, establish no violation of the Equal Protection Clause of the Constitution. Bastas testified that he transcribed trials on a first/in-first/out basis, and he gave no preference to persons who could pay for their transcripts.

### CLAIMS UNDER SECTION 1985(2) OR 1985(3)

The Court permitted Plaintiff Rheuark a trial amendment to allege a conspiracy on behalf of the defendants to deprive Rheuark of the equal protection of laws. 42 U.S.C. § 1985(2) and (3). Although Rheuark has established the liability of the Defendants under § 1983, he has failed to prove a violation of his rights under the Equal Protection Clause, (See discussion above), and he has failed to establish the existence of any conspiracy among the defendants to deprive him of his constitutional rights.

 Rheuark has established that each of the defendants proximately caused the delay in preparing his statement of facts, but there is no evidence that any of

---

**23.** See *Lane v. Brown,* 372 U.S. 477, 83 S.Ct. 768, 9 L.Ed.2d 892 (1963); *Draper v. Washington,* 372 U.S. 487, 83 S.Ct. 774, 9 L.Ed.2d 899 (1963); *Smith v. Bennett,* 365 U.S. 708, 81 S.Ct. 895, 6 L.Ed.2d 39 (1961).

the defendants conspired with each other to cause that delay. The fact that two or more agents of a single business entity participated in the same act will not normally constitute a conspiracy. *Dombrowski v. Dowling,* 459 F.2d 190 (7th Cir. 1972); *Girard v. 94th Street and 5th Avenue Corporation,* 530 F.2d 66 (2nd Cir. 1976), *cert. den'd,* 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1974). For purposes of § 1985(2) or (3) liability the Commissioners Court of Dallas County, Texas is a single business entity. Therefore, the fact that the Commissioners of Dallas County acted together to pursue a policy that deprived Plaintiff Rheuark of his constitutional rights does not establish a conspiracy.

■ The existence of a conspiracy is an essential element to a claim under 42 U.S.C. § 1985, *Simmons v. Zibilich,* 542 F.2d 259 (5th Cir. 1976), and without proof of a conspiracy Rheuark's claim under § 1985 fails.

# DAMAGES

Plaintiffs seek an award of damages for mental and emotional distress they suffered awaiting preparation of their statements of fact, and additional punitive damages to prevent such conduct in the future by the Defendants.

■ Mental and emotional distress caused by the denial of due process is compensable under 42 U.S.C. § 1983. *Carey v. Piphus,* 435 U.S. 247, 264, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978).

■ Punitive damages may be awarded in the discretion of the trier of fact against a defendant under 42 U.S.C. § 1983 when the trier of fact finds:

(1) The Plaintiff is entitled to receive compensatory damages; and

(2) The act which proximately caused the injury to the Plaintiff was maliciously, wantonly, or oppressively done. *Crowe v. Lucas,* 595 F.2d 985 (5th Cir. 1979); *Mansell v. Saunders,* 372 F.2d 573, 576 (5th Cir. 1967).

■ A court may also award nominal damages not to exceed $1.00 without proof of actual injury under 42 U.S.C. § 1983 for the denial of Plaintiffs' procedural due process. *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978).

## Compensatory Damages

In *Carey v. Piphus,* the plaintiffs were suspended from school without a due process hearing. The Supreme Court held on appeal that the plaintiffs were entitled to recover damages for mental and emotional distress *unless* the plaintiffs would have been suspended even if a proper hearing had been held. *Id.* "The (7th Circuit) thought that in such a case, the failure to accord procedural due process would not properly be viewed as the cause of the suspensions" and the Supreme Court agreed. *Id* at 260, 98 S.Ct. at 1050.

■ The facts in this case are analogous to those in *Carey v. Piphus.* In this case if defendants can show that Plaintiffs had or would have had their convictions affirmed on appeal, then Plaintiffs will not be entitled to recover damages to compensate them for injuries caused by the delay in preparing their statements of fact. *Id.*[24]

■ Doescher testified that during his 21 month period of incarceration when he was awaiting preparation of his statement of facts, he felt very frustrated by the delay and unable to prove his innocence on appeal.

Doescher's conviction was affirmed by the Texas Court of Criminal Appeals and he

---

24. A different situation is presented when an appeal is mooted by a delay in preparing a transcript. This could occur when the plaintiff is given a short sentence and the delay in preparing the statement of fact meets or exceeds the time plaintiff serves in jail. The requirements of due process on appeal are much stricter in that situation, and the plaintiff in that situation could well be entitled to compensatory damages for a delay in preparing his statement of facts.

Each of the plaintiffs in this case was given a lengthy sentence and none of their appeals were mooted by the delay in preparing their statements of fact.

presently has a habeas corpus petition pending in this court.[25] Until Doescher receives a final determination on the merits of his habeas petition, and possible retrial, this court cannot determine whether or not Doescher is entitled to compensatory damages. *Carey v. Piphus, supra.* Doescher has established a violation of his constitutional rights, however, and he is at least entitled to $1.00 as nominal damages.

Doescher has also established that he suffered mental and emotional frustration during the period of delay, and the Court leaves open the possibility that in the future Doescher may recover additional compensatory damages.

■ Jordan's conviction was reversed by the Texas Court of Criminal Appeals. He then pled guilty for a three year term in April, 1978. At that time he had served approximately two years and three months flat time of his original twelve-year sentence and had accumulated an additional 21 months good time credit or a total of approximately 3 years, 11 months and 16 days. Jordan argues that if his transcript had been prepared within three months, as required by Texas law, he would have been out of jail six months earlier, and therefore he should be entitled to compensatory damages for that six-month period of unconstitutional delay in preparing his statement of facts.

Jordan has established that Defendants violated his constitutional rights and defendants have the burden of proving that Plaintiff's conviction was affirmed on appeal. *Carey v. Piphus, supra.*

Jordan's conviction was reversed on appeal. Therefore, defendants must show, under *Carey,* that on retrial Jordan was convicted again. If that showing can be made, Jordan would not be entitled to compensatory damages.

■ Jordan was not retried. He pled guilty to three years, although he had accumulated three years, eleven months and 16 days flat and good time credit. If Jordan's statement of facts had been prepared within six months of his notice of appeal,[26] his conviction would have been reversed three months earlier and he could still have been released at that time with a three-year plea bargain based upon his accumulated flat and good time credit. Defendants have failed to show that Jordan's conviction was affirmed and Jordan is entitled to compensatory damages.[27]

Jordan is entitled to receive compensatory damages in the amount of $3,000 for his mental and emotional distress while in jail awaiting his statement of facts and for the prejudice of an additional three months confinement the delay caused him.[28]

■ Rheuark testified that during his 23 months period of delay, he "(f)elt like I was out in the middle of the lake with a rock tied to your feet . . ." and he was downhearted, depressed and worried. Rheuark's conviction was affirmed by the Texas Court of Criminal Appeals. His habeas corpus petition was denied by a Federal District Court in the Northern District of

25. The court dismissed this petition for failure to exhaust state remedies, *Doescher v. Estelle,* 454 F.Supp. 943 (N.D.Tex.1978) and the Fifth Circuit later determined that the appeal was moot when the Texas Court of Criminal Appeals rendered its decision. This court then reopened Doescher's habeas case because he had then exhausted his state remedies.

26. Jordan argues that his statement of facts should have been prepared within 90 days of his notice of appeal, as specified by Texas law. However, that law provides for extensions for good cause, and the court finds that it would be reasonable to prepare Jordan's statement of facts within 6 months of his filing a notice of appeal.

27. Defendants argue that good time should not be considered by the court in making this finding. Jordan had only accumulated two years, seven months flat time when he pled guilty to three years, and he was released immediately. Clearly the prosecutor considered good time credit when he negotiated the plea, and it is reasonable to conclude that he would consider good time credit if Jordan's conviction had been reversed six months earlier.

28. Even without these compensatory damages, Jordan would still be entitled to at least nominal damages of $1.00.

Texas, and that decision was affirmed on appeal by the United States Court of Appeals for the Fifth Circuit. Rheuark is not entitled to compensatory damages, but he has established a violation of his constitutional rights and is therefore entitled to $1.00 as nominal damages.

### Punitive Damages

Punitive damages are awarded to deter or punish malicious deprivations of rights, and, in an appropriate case, may be awarded to accomplish those goals where the plaintiff is awarded only nominal damages for a violation of constitutional rights. See Carey v. Piphus, supra.

Plaintiffs are not entitled to an award of punitive damages, however, because there was no showing that the defendants' actions were malicious, wanton or oppressive.[29]

### INJUNCTIVE RELIEF

Plaintiffs have requested injunctive relief to secure their transcripts and to restrain the defendants from adhering to the practices which led to unconstitutional delays in processing their statements of fact. Each of these plaintiffs has now received his statement of facts, so that portion of the requested injunctive relief is moot.

Defendants suggest that Plaintiffs' request for future relief from these unconstitutional practices also must now be moot because Plaintiffs' statements of fact have been prepared.

Plaintiffs alleged a case or controversy within the meaning of Article III of the Constitution when they requested this court to enjoin the defendants from continuing with the practice that unreasonably delayed preparation of their statements of fact. Plaintiffs suffered actual injury as a result of the putatively illegal conduct of the defendants. *Gladstone Realtors v. Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60

L.Ed.2d 66, 76 (1979); *Babbitt v. United Farm Workers National Union,* —— U.S. ——, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979); *Duke Power Co. v. Carolina Environment Study Group,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978).

While the usual rule in federal cases is that an actual controversy must exist at all stages of the proceedings, including appellate review, *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1972), in this case the period of time it takes to prepare a statement of facts is so short that plaintiffs will receive their statements of fact before the usual trial and appellate process is completed. If receipt of the statement of facts makes a case moot, litigation seeking speedier appellate review seldom will survive the trial stage or much beyond, and review will be effectively denied. "Our law should not be that rigid" where the problem is capable of repetition, yet evades review. *Roe v. Wade,* 410 U.S. 113, 125, 93 S.Ct. 705, 713, 35 L.Ed.2d 147 (1972). Plaintiffs' receipt of their transcripts has not entirely mooted their claims for injunctive relief.

I must, however, reject Plaintiffs' request for injunctive relief on other grounds. In *O'Shea v. Littleton,* 414 U.S. 448, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) certain residents of Cairo, Illinois, brought a class action suit under 42 U.S.C. § 1981, Section 1982, Section 1983, and Section 1985 seeking to enjoin a county magistrate and judge from arbitrarily setting bond in criminal cases, discriminatorily imposing sentences, and forcing certain residents to pay for a trial by jury when charged with violations of City Ordinances which carried fines and possible jail sentences if the fine could not be paid. The Supreme Court concluded that the Plaintiffs did not seek to enjoin any state statute or enjoin any criminal prosecutions, but rather sought to prevent the occurrence of specific events that might take place during the course of future crim-

---

**29.** After the court's decision today, and the representations made at trial that currently statements of fact are being processed within a six months maximum time period, the court would be justified in imposing punitive damages for any excessive delays that violated a petitioner's due process rights after today's date.

inal trials. The Court observed that "(a)n injunction of the type contemplated by (Plaintiffs) . . . would disrupt the normal course of proceedings in the state via resort to the federal suit for determination of the claim ab initio . . . (and) it would require for its enforcement the continuous supervision by the federal court over the conduct of the petitioners in the course of future criminal trial proceedings . . ." *Id* at 501, 94 S.Ct. at 679. The Supreme Court rejected this attempt to inject the equitable powers of the federal courts into the daily conduct of state criminal proceedings.

I conclude that this court should not exercise its equitable powers and intrude into the daily operation of the Texas state criminal system. As the Supreme Court noted in *O'Shea* and as has been demonstrated in this opinion, there are other remedies at law for this type of conduct, including nominal, compensatory, and punitive damages. It would also be inappropriate to undertake such a major intrusion into state appellate affairs when the testimony at trial indicates that the problem is being corrected, and statements of fact are now being prepared within a six months maximum time frame. The Court strongly urges the defendants to insure statements of fact in the future are prepared within the guidelines of due process, but other than this warning, plaintiffs' specific request for injunctive relief is denied.

### ATTORNEYS' FEES

■ A successful civil rights plaintiff should ordinarily recover an attorney's fee under Section 1988 unless special circumstances would render such an award unjust. *Gore v. Turner,* 563 F.2d 159, 163 (5th Cir. 1977). The Court must consider 12 factors on the issue of attorney's fees, see *Rainey v. Jackson State College,* 551 F.2d 672, 676 (5th Cir. 1977), and at a hearing on August 10, 1979 at 11:00 a. m., the Plaintiffs must be prepared to submit evidence on each of the above factors.

■ A plaintiff who recovers only nominal damages for violations of his con-

stitutional rights may receive an award of attorney fees. 42 U.S.C. § 1988; *Perez v. University of Puerto Rico,* 600 F.2d 1 (1st Cir. 1979). The minimal recovery will be one factor evaluated by the Court in its fee award determination, but public policy may support an award of counsel fees to vindicate a public right at a cost which is high in comparison to plaintiff's damage recovery. *Knight v. Auciello,* 453 F.2d 852 (1st Cir. 1972).

### DAMAGE DEFENSES

#### *Judicial Immunity*

■ Defendants Metcalf and each of the Dallas County Commissioners assert that they are immune as judges from damage liability under 42 U.S.C. § 1983. "A judge is absolutely immune from liability for his judicial acts even if his exercise of authority is flawed by the commission of grave procedural errors." *Stump v. Sparkman,* 435 U.S. 349, 359, 98 S.Ct. 1099, 1106, 55 L.Ed.2d 331, 341 (1978). When judicial immunity for an act is asserted, the court must determine whether that act is a function normally performed by a judge, whether the parties dealt with the judge in his judicial capacity, and whether the acts were not committed "in the clear absence of all jurisdiction." *Id* 435 U.S. at 357, 98 S.Ct. at 1105, 55 L.Ed.2d at 339; *See Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976).

■ Plaintiffs' complaint against Metcalf is based upon Metcalf's appointment of his court reporter, Paul Bastas, Metcalf's failure to insure that Bastas prepared the Plaintiffs' statements of fact in a timely manner, and Metcalf's failure to appoint additional court reporters and relieve Bastas of non-statutory duties so that Bastas could devote his full energies to transcribing the backlog of statements of fact.

Metcalf had the jurisdictional authority to appoint court reporters and the appointment of court reporters is a function normally performed by a judge, as is the overseeing of the reporter's preparation of the statements of fact. Tex.Rev.Civ.Stat.Ann.

920

Art. 2321 (Vernon's Supp.1978); *Slavin v. Curry,* 574 F.2d 1256 (5th Cir. 1978). The parties in this case dealt with Metcalf as a judge when they requested that he order their statements of fact prepared, and on subsequent occasions when they inquired about the status of their appeals. Judge Metcalf is absolutely immune from damages for his actions in this case. *Stump v. Sparkman,* 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978).

Each county in Texas has a County Court, with a County Judge as its presiding officer, Texas Const. Art. 5, § 15, and the judge is elected in each county to hold office for four years. Tex.Const. Art. 5, § 15.

■ The County Court has jurisdiction over certain civil cases when the matter in controversy exceeds $200.00, but does not exceed $1,000.00, and appellate jurisdiction through the granting of a trial de novo over certain civil and criminal matters of which the justices' courts have original jurisdiction. Texas Const. Art. 5, § 16. The County Court also may have the general jurisdiction of a probate court. Tex.Const. Art. 5, § 8.

■ The County Court has no criminal jurisdiction where there is a criminal district court unless expressly conferred by law. Tex.Const. Art. 5, § 16. The county court and judge may issue writs of mandamus, injunction and all other writs necessary to enforce their jurisdiction, including writs of habeas corpus in cases where the offense charged is within the jurisdiction of the county court. *Id.*

■ The Legislature has the power to change the civil and criminal jurisdiction of the county courts. Texas Const. Art. 5, § 22. A County Judge of any county having a population of more than 500,000 may act for the judge of any county court at law in civil or criminal cases during the absence or inability of the judge of the county court at law to perform such duties if he is a duly licensed attorney. Tex.Rev.Civ.Stat. Arts. 1969a–2, 3.

The Dallas County Courts at Law have original and concurrent jurisdiction with the County Court of Dallas County, in all civil and criminal matters, original and appellate. Tex.Rev.Civ.Stat. Art. 1970–3, Art. 1970–16, Art. 1970–31.1; Art. 1970–31.2; Art. 1970–31.10, Art. 1970–31.15, Art. 1970–31.20. Article 1970–4 provides that the County Court of Dallas County retains the general jurisdiction of a probate court, but Art. 1970–31a, 31b, and 31c make that jurisdiction concurrent with various probate courts of Dallas County.

■ The Texas Constitution provides that each county in the State of Texas shall elect four County Commissioners, one from each of four precincts within each county. Texas Const. Art. 5, Section 18. The Commissioners so chosen, along with the County Judge as the presiding officer, compose the County Commissioners Court, which may exercise those powers permitted by law. *Id.*

Article 2351 enumerates the powers of the Commissioners Court which include building and maintaining county roads, bridges, ferries, jails, courthouses and other county projects. See generally, Tex.Rev. Civ.Stat., Art. 2339 et seq. Except in a few instances, e. g. the ability to punish contempts by fine, all of the powers of the Commissioners Court are legislative or administrative powers.

Plaintiffs' complaint against County Judge Whittington is based upon Whittington's attempts to limit the amount of money spent by the district judges for court reporters, and his efforts to discourage the appointment of additional court reporters, despite the court's awareness that these court reporters were primarily being used to alleviate a backlog in transcribing statements of fact. These budgetary actions are not those normally performed by a judge, and none of the parties dealt with Whittington as a judicial officer. Finally, Judge Whittington, by his own admission, in the clear absence of all jurisdiction, approved of a letter from the Commissioners' Court to the district judges requesting that the district judges receive prior Commissioners

Court approval before approving additional expenditures for court reporters' services.

 A County Judge in Dallas County, Texas wears three hats. *See Avery v. Midland County,* 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968). He may technically perform the judicial functions granted to him by the Texas Constitution and by statute, although there is no evidence in this record that Judge Whittington has ever done so. The County Judge also has the legislative and administrative duties of managing, with the other members of the Commissioners Court, the county budget and approving expenditures of county funds, and as such is part of the governing body of Dallas County. Judge Whittington's violations of Plaintiffs' constitutional rights were actions which were taken as part of his legislative and administrative duties in governing Dallas County, and were not judicial acts. They were also actions admittedly taken in the clear absence of all jurisdiction, and therefore may not receive the cloak of judicial immunity.

The other members of the Dallas County Commissioners Court do not have the constitutional and statutory authority to perform judicial functions granted to a county judge. They only possess very limited judicial powers specified in Art. 2339 et seq. Plaintiffs' complaint against the Commissioners is essentially the same as against Judge Whittington, and for the same reasons their actions are not entitled to judicial immunity.

### Legislative Immunity

"Legislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good . . ." (and it is) "not consonant with our scheme of government for a court to inquire into the motives of legislators . . ." *Tenney v. Brandhove,* 341 U.S. 367, 377, 71 S.Ct. 783, 788, 95 L.Ed. 1019 (1951).

 As the Supreme Court noted in *Tenney,* the reason for the privilege is to encourage public legislative representatives to discharge their duties with the fullest measure of freedom of speech and of action. *Id.* at 372–373, 71 S.Ct. 783. The privilege extends to federal, state and regional legislators. *Lake County Estates Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979). I must now decide whether or not individuals performing legislative functions at a local level are also afforded absolute immunity under 42 U.S.C. § 1983 for their legislative acts, a question specifically left open by the Supreme Court in *Lake County Estates.* See 440 U.S. 391, 404 fn. 26, 99 S.Ct. 1171 (1979).

The reasons for the legislative immunity privilege are equally applicable to county legislators acting in their legislative capacity, and it is not anomalous to establish a greater degree of immunity for county legislators than is given to a county. As Justice Marshall observed in his separate opinion in *Lake County,* "The majority's reasoning in this case leaves little room to argue that municipal legislators stand on a different footing than their regional counterparts." *Id* at 407, 99 S.Ct. at 1181.

In *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) the Supreme Court held that a municipality is a suable entity under 42 U.S.C. § 1983. At that time the Supreme Court expressed no views on the scope of municipal immunity "beyond holding that municipal bodies sued under Section 1983 cannot be entitled to an absolute immunity, lest our decision that such bodies are subject to suit under § 1983 'be drained of meaning', *Scheuer v. Rhodes,* 416 U.S. 232, 248, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)". 436 U.S. 658, 701, 98 S.Ct. 2018, 2041, 56 L.Ed.2d 611 (1978). Dicta in *Crowe v. Lucas,* 595 F.2d 985 (5th Cir. 1979) suggests that the Supreme Court's denial of absolute immunity to a municipality means that no municipal official may enjoy absolute immunity. The court in *Crowe v. Lucas,* basing its decision upon *Scheuer v. Rhodes,* 416 U.S. 232, 248, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (governor or high executive officer entitled to only qualified immunity), held that the mayor and aldermen of

the City of Mound Bayou, Mississippi were state executive officials entitled to only qualified immunity.

■ The County Judge and Commissioners in this case are not high executive officials, and perform functions which are not analogous to those performed by a governor of a state. The Judge and Commissioners formulate programs for the construction of roads, buildings, and other structures in Dallas County. They are empowered by statute with the authority to care for paupers and indigents. After developing these programs, they must vote them into existence and vote for their funding. Like federal, state or regional legislatures, the Commissioners Court oversees an administrative bureaucracy designed to implement their decisions. Like federal, state and regional legislatures, their members are elected on a regular basis by the people. Thus, to the extent that the individual defendants were acting in a capacity comparable to that of members of a state legislature, they are entitled to absolute immunity from damages under 42 U.S.C. § 1983. *Lake County, supra.*

■ *Monell* does not alter this result. Other county officials, although not all county officials, have absolute immunity for their actions, although the county itself may be liable for those actions *if* execution of a county government policy or custom inflicts the injury. *Monell, supra,* 436 U.S. at 694, 98 S.Ct. 2018. *Monell* does not affect the absolute immunity of county judges for performing judicial acts, *Stump v. Sparkman,* 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978), or the absolute immunity of county prosecutors performing their prosecutorial functions. *Butz v. Economo,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). The Supreme Court recognizes that these county officials enjoy a greater degree of immunity than is given to the county itself, and it is therefore consistent with *Monell* to include county legislators performing legislative acts as a third class of county officials who are protected by absolute immunity.

When legislative immunity for an act is asserted, the court must determine whether that act is a function normally performed by a legislator and whether the parties dealt with the legislator in a legislative capacity. Plaintiffs argue that the payment of deputy court reporters' salaries by the Commissioners is an administrative act, not entitled to legislative immunity. Article 2323, Tex.Rev.Civ.Stat. authorizes district judges to appoint deputy court reporters, to be paid in the manner provided for the official court reporter. The judge appoints the reporter and fixes his compensation; the Commissioners Court must then make provisions for payment. Tex.Rev.Civ. Stat. Art. 2326 et seq. The Commissioners still retain some control over the timing of payments when the requests for funds exceed the budgetary allotment.

■ All of the acts committed by the defendant Commissioners and the County Judge which violated Plaintiffs' constitutional rights were related to the Commissioners Court's governing authority over the county budget and were legislative acts. The Commissioners and County Judge are absolutely immune from damages from these legislative acts.

### Scope of Municipal Immunity

"A local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. New York City Department of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2038, 56 L.Ed.2d 611 (1978).

This case unquestionably involves official county policy which proximately resulted in the violation of Plaintiffs' constitutional rights. The Dallas County Commissioners, as a matter of official policy, sent letters to the district judges of Dallas County requesting that they respect the budgetary ceilings set for payment of court reporters.

They occasionally refused to pay the salaries of court reporters, and their actions had a chilling effect on Judge Metcalf's attempts to decrease his court reporter's backlog of statements of fact awaiting transcription.

■ The Commissioner's efforts to limit the budgetary allocations for court reporters which proximately resulted in unconstitutional delays in preparation of Plaintiffs' statements of fact predated this lawsuit, and even if all of these actions were not formally endorsed by the Commissioners' Court, it was clearly the custom of the Commissioners and the County Judge to oppose increased allocation of funds for court reporters. Under *Monell*, governmental "custom", even if not formally endorsed by a lawmaking body, may give rise to § 1983 liability. *Id.* at 691, 98 S.Ct. 2018.

Dallas County asserts that it is entitled to the same immunity as its officials. It reasons that members of Commissioners Court are absolutely immune for their legislative acts; therefore, Dallas County is absolutely immune for those same actions.

Although the Supreme Court has held that municipal governments are not absolutely immune, *Monell, supra,* a recent decision by a district court in Vermont, after an extensive analysis, seems to support by analogy Dallas County's immunity argument. *Ohland v. City of Montpelier,* 467 F.Supp. 324 (D.C.Vt.1979). In *Ohland,* the Court concluded that a governmental entity was not liable for damages to a discharged city policeman when the governmental decision makers responsible for an unconstitutional policy or custom were entitled to qualified immunity.

■ Municipal immunity is not derivative immunity. Municipal governments are not entitled to the same scope of immunity as municipal governmental decision makers responsible for an unconstitutional policy or custom.

The basis of absolute immunity for judges, prosecutors and legislators acting within the scope of their duties is not applicable to municipal governmental bodies.

While courts have been concerned that judges, prosecutors and legislators be free from concerns of harassment and embarrassment over their decisions, and have an opportunity to fearlessly and impartially administer the laws, municipal governments are not going to feel the same constraints and have no need for similar protection. See *Lake Country Estates Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979); *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978); *Stump v. Sparkman,* 435 U.S. 349, 360, 98 S.Ct. 1099, 1106, 55 L.Ed.2d 331, 341 (1978); *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976).

■ The liability of municipalities is very limited under *Monell* ; and a municipal government is not liable under respondeat superior for every error committed by an official. Liability occurs only if the municipality has adopted the illegal practice as a policy or custom, and further limitations on municipal liability are not warranted.

■ Dallas County does not have derivative absolute immunity from any liability for damages when its Commissioners are entitled to absolute legislative immunity.

*Qualified Immunity*

The Supreme Court in *Monell* rejected the idea that municipal governments are insurers for the actions of municipal officials. Dallas County asserts that the defense of qualified immunity is a further limitation on the scope of municipal liability.

■ I do not need to reach this issue because the Commissioners themselves are not entitled to qualified immunity. Any municipal qualified immunity would not be co-extensive with the qualified immunity of municipal officials and in fact would not be as broad an immunity. *Ohland v. City of Montpelier,* 467 F.Supp. 324 (D.C.Vt.1979).

An official is liable under § 1983 "if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the con-

stitutional rights" of the person affected, *Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed. 214 (1975), although an official is not "charged" with predicting the future of constitutional law. *Wood*, 95 S.Ct. at 1001, quoting *Pierson v. Ray*, 386 U.S. 547, 557, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967).

■ An official also forfeits his qualified immunity if his subjective intent was to harm the plaintiff. *Bogard v. Cook*, 586 F.2d 399 (5th Cir. 1978). A plaintiff must show that an official either actually intended to do harm to the plaintiff, or took an action which, although not intended to do harm, was so likely to produce injury that the harm can be characterized as substantially certain to result. *Id.* at 412.

■ The Commissioners did not take their actions in good faith, but rather with the knowledge that their attempts to limit the number and use of court reporters violated the law and that the actions were inhibiting efforts to reduce the backlog of preparing statements of fact. Their actions contravene settled state and constitutional law, and they knew or reasonably should have known that their actions were so likely to violate Plaintiffs' constitutional rights that such occurrence was substantially certain to result. Therefore, the Commissioners are not entitled to qualified immunity, and neither is Dallas County.

■ County court reporters may raise the defense of qualified immunity if they can establish that they were acting pursuant to lawful authority, followed in good faith the rules of the court, and their actions did not contravene those court instructions or rules. *Slavin v. Curry*, 574 F.2d 1256 (5th Cir. 1978). This test for qualified immunity of court reporters is broader than the test for qualified immunity of executive officials found in *Wood, Scheuer* and other Supreme Court decisions.

■ Paul Bastas at all times was acting pursuant to his statutory authority as a court reporter and he followed in good faith the instructions of the court. He is therefore immune from any damage liability in this case.

## ATTORNEYS FEES DEFENSES

### Sovereign Immunity

Attorneys fees in civil rights actions brought under 42 U.S.C. § 1983 are awarded to prevailing parties "as a part of the costs". 42 U.S.C. § 1988. "Just as a federal court may treat a state like any other litigant when it assesses costs, so also may Congress amend its definition of taxable costs . . . without expressly stating that it intends to abrogate the States' Eleventh Amendment immunity." *Hutto v. Finney*, 437 U.S. 678, 696, 98 S.Ct. 2565, 2577, 57 L.Ed.2d 522, 538 (1978).

■ Costs may be awarded against an official of a local governmental unit in his official capacity because local governmental units, for Eleventh Amendment purposes, are not considered part of the state, *Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979); *Monell v. Department of New York Department of Social Services*, 436 U.S. 648, 690 fn. 54, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Lincoln County v. Luning*, 133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766 (1890), and in addition by enacting 42 U.S.C. § 1988 "Congress intended to override the Eleventh Amendment immunity of the States and authorize fee awards payable by the States when their officials are sued in their official capacities". *Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979); *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *Morrow v. Dillard*, 580 F.2d 1284 (5th Cir. 1978).

### Judicial Immunity

■ Defendant Metcalf is clearly immune in his individual capacity for personal liability for Plaintiffs' attorney's fees. Commissioner defendants are entitled to judicial immunity for all of their "judicial acts" but their actions in this case were not judicial acts.

Defendant Metcalf, in his official capacity, is not immune from liability for attor-

ney's fees. The legislative history of 42 U.S.C. § 1988 and the statute itself indicate that judicial officers can be liable for attorney's fees under § 1988. *Consumers Union of United States Inc. v. American Bar Association*, 470 F.Supp. 1055 (E.D.Va.1979).

The statutory language of 42 U.S.C. § 1988 "could not be broader" and "applies to 'any' action brought to enforce certain civil rights." *Hutto v. Finney*, 437 U.S. 678, 694, 98 S.Ct. 2565, 2575, 57 L.Ed.2d 522 (1978).

The legislative history indicates that Congress specifically rejected extending judicial immunity from damages from 42 U.S.C. § 1988 actions for attorneys fees. H.R.Rep. No.94–1558, 94 Cong.2nd Sess. 9 (1976).

This court has the authority to order Defendant Metcalf, in his official capacity, to pay Plaintiffs' reasonable attorney's fees. *Consumers Union of United States Inc. v. American Bar Association*, 470 F.Supp. 1055 (E.D.Va.1979); *Alsager v. District Court*, 447 F.Supp. 572 (S.D.Ia.1977); *White v. Crowell*, 434 F.Supp. 1119 (W.D.Tenn.1977).

### Legislative Immunity

The Commissioners of Dallas County, in their individual capacities, are immune from personal liability for Plaintiffs' attorneys fees. The Commissioners, in their official capacities, are not immune from liability for attorney's fees. The legislative history of 42 U.S.C. § 1988 and the statute itself indicates that legislative officials can be liable for attorney's fees under § 1988, applying the same reasoning in which I earlier held that a judicial officer can be liable for attorney's fees under § 1988. *Consumers Union of United States Inc. v. American Bar Association*, 470 F.Supp. 1055 (E.D.Va.1979).

### Qualified Immunity

I have previously held that Dallas County has not established its qualified immunity defense and therefore it is liable for attorneys fees under 42 U.S.C. § 1988. Although Paul Bastas has established a qualified immunity defense in his individual capacity from personal liability for plain-

tiffs' attorneys fees, he is liable in his official capacity for Plaintiffs' attorney fees under 42 U.S.C. § 1988. *Rainey v. Jackson State College*, 591 F.2d 1002 (5th Cir. 1979); *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *Morrow v. Dillard*, 580 F.2d 1284, 1298 (5th Cir. 1978).

It is so ORDERED.

### ATTORNEYS FEES

An award of attorneys' fees to a "prevailing" party in a case brought to enforce a provision of 42 U.S.C. § 1981, 1982, 1983, 1985, or 1986 may be awarded as a part of the costs in the Court's discretion. 42 U.S.C. § 1988. Although two of these cases were filed before § 1988 was amended to permit the recovery of attorneys' fees as costs, attorneys' fees may be awarded in any appropriate case pending on the date of the enactment of the amendment and these cases were pending on that date. *Universal Amusement Co., Inc. v. Vance*, 587 F.2d 159, 172 (5th Cir. 1978) (en banc); *Gore v. Turner*, 563 F.2d 159 (5th Cir. 1977).

### Defendants' Immunity

The Court has determined that each of the Defendants violated the constitutional rights of each of the Plaintiffs. Plaintiffs are entitled to damages for these violations. Some of the Defendants are immune in their individual capacities from an award of damages. These Defendants, particularly Metcalfe and Bastas, now urge that Plaintiffs have not prevailed against them, and that their immunity shields them from an award of attorneys' fees under Section 1988.

In *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), the Supreme Court recognized that Congress had the power to abolish the common law defense of judicial immunity, if it chose to do so, in damage actions under 42 U.S.C. § 1983. The Supreme Court concluded, after an exhaustive review of the legislative history of the statute, that Congress gave ". . . no clear indication that . . . (it) meant to abolish wholesale all common-law

immunities." *Pierson v. Ray*, 368 U.S. at 554, 87 S.Ct. at 1218.

█ Congress was not silent on the question of common law immunities when it enacted 42 U.S.C. § 1988. The purpose of the Attorney's Fee Statute was to encourage private enforcement of the nation's civil rights laws. The Senate noted that often the average citizen was financially unable to vindicate his rights.

"In many cases arising under our civil rights laws, the citizen who must sue to enforce the law has little or no money with which to hire a lawyer."

S.Rep. No. 94–1011, at 2, U.S. Code Cong. and Admin. News, 1976 at 5908, 5910.

The Senate recognized that not all civil rights suits would be brought against private parties:

". . . defendants in these cases are often State or local bodies or State or local officials. In such cases it is intended that the attorneys' fees, like other items of cost, will be collected either directly from the official, in his official capacity, from funds of his agency or under this control, or from the State or local government (whether or not the agency or government is a named party)."

S.Rep. No. 94–1011 at 5, U.S. Code Cong. and Admin. News, 1976 at 5913 (footnotes omitted).

The House also addressed the question of immunities, concluding that although an immunity defense may limit or eliminate damages awarded against certain public officials, the Court should award attorneys' fees in these cases to plaintiffs who have established a violation of their constitutional rights.

". . . [I]n some cases, immunity doctrines and special defenses, available only to public officials, preclude or severely limit the damage remedy.[17] [citing *Pier-*

son v. Ray*, 386 U.S. 547 [87 S.Ct. 1213, 18 L.Ed.2d 288] (1967)] Consequently awarding counsel fees to prevailing plaintiffs in such litigation is particularly important and necessary if federal civil and constitutional rights are to be adequately protected."

H.Rep. No. 94–1558, 94th Cong., 2d Sess. 9 (1976).

The Supreme Court has recognized that Congress has the power to set aside the state's immunity from retroactive relief in order to enforce the Fourteenth Amendment, *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), and that Congress used that power when it enacted 42 U.S.C. § 1988, permitting Plaintiffs to recover attorney fees from the state. *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978).

"The greater resources available to governments provide an ample base from which fees can be awarded to the prevailing plaintiff in suits against governmental officials or entities".

H.Rep. No. 94–1558, 94th Cong. 2d Sess. 7 (1976).

█ In *Hutto*, the Supreme Court rejected the argument posed by the State of Arkansas that Congress had to expressly list in the statute each abrogation of state immunity. *Hutto v. Finney*, 437 U.S. 697, 98 S.Ct. 2577, 57 L.Ed.2d 538 (1978). The same reasoning applies to the defendants' claims of judicial, legislative, and qualified immunity.[1]

The Fifth Circuit has also recognized in an *en banc* decision that ". . . Congress intended to lift the veil of immunity from state and local governments . ." in awarding attorneys fees under § 1988 when the defendants were state or local officials or state or local bodies, although "the Attorney's Fee Award Act does not change judicially established rules govern-

---

1. The Court notes that the County Commissioners may only be entitled to qualified immunity rather than absolute legislative immunity. *Heimbach v. Village of Lyons*, 597 F.2d 344 (2nd Cir. 1979). If they are only entitled to qualified immunity from damages, the court's findings would hold them individually liable for the damages awarded, and an award of attorney's fees against the Commissioners in their individual, as well as their official, capacities then would be proper under 42 U.S.C. § 1988.

ing individual immunity for unconstitutional acts committed by a person acting in official capacity." *Universal Amusement Co., Inc. v. Vance,* 559 F.2d 1286, 1301 (5th Cir. 1977), affirmed and adopted in pertinent part, 587 F.2d 176 (5th Cir. 1978) (en banc).

*"Bad Faith" Liability for Attorney's Fee*

 Metcalfe and Bastas contend a finding of bad faith is required before this court may award Plaintiffs their attorneys' fees as prevailing parties. In *Hutto,* however, the Supreme Court awarded the Plaintiffs attorney fees against the state for the Plaintiffs' efforts at the Circuit Court level, in spite of the claims of immunity and the lack of any finding by the Circuit Court of bad faith. A finding of bad faith, the Supreme Court noted, was unnecessary to an award of attorney's fees under § 1988. "It is also clear that this order is not supported by any finding of bad faith. It is founded instead on the provisions of the Civil Rights Attorney's Fees Awards Act of 1976. Pub.L. No. 94–559, 90 Stat. 2641, 42 U.S.C. § 1988, (1976 ed.)." *Hutto* 437 U.S. at 693, 98 S.Ct. at 2575, 57 L.Ed.2d at 536.

> "Awards against the official in his individual capacity, in contrast, were not affected by the statute; in injunctive suits they would continue to be awarded only 'under the traditional bad faith standard recognized by the Supreme Court in *Alyeska.*'"

S.Rep. No. 94–1011, p. 5, n. 7 (1976); *Hutto v. Finney,* 437 U.S. 700, 98 S.Ct. 2579, 57 L.Ed.2d 540 (1978). There is no indication that any of these defendants acted in bad faith; therefore, the attorney's fees in this case will be awarded against the individual defendants in their official capacities only. *Consumers Union of United States v. American Bar Association,* 470 F.Supp. 1055 (E.D.Va.1979).

*Prevailing Party*

Plaintiffs brought these suits to secure their transcripts in order to pursue state criminal appeals. Plaintiffs have prevailed in this litigation by establishing a fundamental violation of their constitutional rights, for which two of the Plaintiffs are entitled to $1.00 each as nominal damages, and the third plaintiff is entitled to $3,000 damages.

The legislative history of 42 U.S.C. § 1988 strongly suggests that an award of damages is not a prerequisite to an award of attorney's fees. The Senate Report states that: "Such awards are especially appropriate where a party has prevailed on an important matter in the course of litigation, even when he ultimately does not prevail on all issues." S.Rep. No. 94–1011, 5 U.S. Code Cong. and Admin. News pp. 5908, 5912 (1976). In *Nadeau v. Helgemoe,* 581 F.2d 275, 279 (1st Cir. 1978), the court held that: "Plaintiffs may be considered prevailing parties for attorney's fees purposes if they succeeded on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit."

In this case the Plaintiffs have succeeded on the most significant issue of the litigation, and have received "some benefit." Plaintiffs began this litigation early in 1976 and 1977 seeking to obtain copies of their trial transcriptions and alleging violations of their civil rights. As a direct result of this rather prolonged litigation, Plaintiffs in fact received copies of their trial transcriptions. In addition, this litigation has resulted in factual findings by this court that each of the individual Defendants violated the Plaintiffs' constitutional rights by their actions, and the Court concluded:

> "Delays of nine, twenty, and twenty-three months in preparing the transcripts of the reporter's notes violate constitutional due process and the constitutional commitment to speedy justice for all. U.S.Const. Art. 14."

*Rheuark v. Shaw,* 477 F.Supp. 897, 910 (N.D.Tex.1979).

*Section 1988 applied to Section 1983 Actions*

 Defendant Bastas argues that prevailing Plaintiffs may be awarded attorneys' fees under 42 U.S.C. § 1988 only "in suits brought to enforce the Civil Rights Acts, which Congress has passed since 1866 . . ." S.Rep. No. 94–1011, U.S. Code

Cong. and Admin. News at 5910. Bastas argues that attorneys' fees may not be awarded when a Plaintiff seeks a remedy for a constitutional wrong, as opposed to damages or injunctive relief created by statute, law or other act.

I reject Defendant's imaginative argument. The statute specifically provides for recovery of attorney's fees for actions brought pursuant to 42 U.S.C. § 1983, and makes no distinction between "statutory" rights and "constitutional" rights. In *Hutto v. Finney*, the Supreme Court permitted an award of attorney's fees after finding that conditions in the Arkansas Penal System constituted cruel and unusual punishment, a constitutional violation. Similarly, the Fifth Circuit has held that "[I]t is clear beyond question that § 1988 as amended applies to suits brought pursuant to 42 U.S.C. §§ 1981 and 1983 (1970) . . . (and) . . . [b]ecause an action for an injunction to redress the unconstitutional composition of grand and petit juries lies under 42 U.S.C. § 1983 (1970) (citations omitted), § 1988 is applicable here." *Brown v. Culpepper*, 559 F.2d 274 (5th Cir. 1977).

Finally, 42 U.S.C. § 1983 was enacted in 1871, and is thus a Civil Rights Act passed by Congress after 1866.

*Pro Se Attorneys Fees*

■ Plaintiff Rheuark and the other plaintiffs have requested pro se attorney's fees for the time they spent unaided by counsel in pursuing this litigation. This request is a case of first impression, and there are no cases which directly support such a ruling under 42 U.S.C. § 1988. The Court must turn to the legislative history of the statute for guidance.

The Senate report on the statute indicates that fees should be awarded which will be

". . . adequate to attract competent counsel, but which do not produce windfalls to attorneys . . . if the cost of private enforcement actions becomes too great, there will be no private enforcement. If our civil rights laws are not to become mere hollow pronouncements which the average citizen cannot enforce,

we must maintain the traditionally effective remedy of fee shifting in these cases."

S.Rep. No. 94–1011, U.S. Code Cong. and Admin. News, at 6, page 5913 (1976.)

These excerpts from the Senate's comments on the statute illustrate the Senate's concern that the cost of hiring legal assistance might deny many citizens effective access to the courts to vindicate their civil rights.

"In many cases arising under our civil rights laws, the citizen who must sue to enforce the law has little or no money with which to hire a lawyer. If private citizens are to be able to assert their civil rights, and if those who violate the nation's fundamental laws are not to proceed with impunity, then citizens must have the opportunity to recover what it costs them to vindicate these rights in court."

S.Rep. No. 94–1011, U.S. Code Cong. and Admin. News, at 2, page 5910 (1976).

A pro se prisoner cannot claim that he has foregone any income in his own business to pursue his civil rights claim. The legislative history indicates that Congress intended to compensate attorneys, not pro se litigants. The law created "no startling new remedy". S.Rep. No. 94–1011, U.S. Code Cong. and Admin. News, at 6, page 5913 (1976). An award of pro se attorney's fees to indigent prisoners would be a startling new remedy, one not contemplated by Congress in enacting 42 U.S.C. § 1988.

Plaintiffs cite three D.C. Circuit Freedom of Information Act cases in support, by analogy, of their motion for pro se attorneys' fees. *See Cox v. United States Department of Justice*, 195 U.S.App.D.C. ——, 601 F.2d 1 (D.C.Cir.1979); *Cuneo v. Rumsfeld*, 180 U.S.App.D.C. 184, 553 F.2d 1360 (D.C.Cir.1977); *Holly v. Acree*, 72 F.R.D. 115 (D.C.D.C.1976). Each of these cases base the award of attorney's fees to an unrepresented litigant upon an interpretation of certain modifying language used in the statute, 5 U.S.C. § 552(a)(4)(E), language not present in 42 U.S.C. § 1988.

I therefore conclude that it is not appropriate to award pro se attorneys' fees to the Plaintiffs in this case.

*Amount of Attorneys Fees*

The Fifth Circuit has indicated that the court should take into consideration twelve factors in analyzing a request for attorney's fees in a civil rights case. *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). The twelve factors are listed in the *Johnson* opinion, and also in *Clark v. Lomas & Nettleton Financial Corp.*, 79 F.R.D. 641, 653 (N.D.Tex.1978). I have considered all of these factors in making my fee award determination in this case.

The Court appointed attorneys for each of the Plaintiffs. Plaintiff Rheuark's attorneys were Vincent W. Perini and Elizabeth Unger Carlyle. Mr. Perini has practiced law for thirteen years, with a concentration in criminal law and considerable experience in the civil rights area. He is board certified in criminal law by the Texas Board of Legal Specialization, and is now president of the Texas Criminal Defense Lawyers Association. He was also president of the Dallas Legal Services Foundation.

Elizabeth Unger Carlyle was admitted to the Bar in November of 1977, and, working primarily under Mr. Perini's supervision, has done a variety of work in the criminal and civil rights areas. Plaintiff Doescher's attorneys are Tedford E. Kimbell and Janet Babcock. Mr. Kimbell is a member of the State Bar of Texas and has been admitted to practice before the Northern District of Texas, the Eastern District of Texas, and the Fifth Circuit Court of Appeals. He has practiced law for ten years, and during all of that time has been a trial lawyer, actively involved in the trial of numerous civil lawsuits on both sides of the docket before courts and juries in state and federal cases.

Janet Babcock has practiced law for two years, and is a member of the State Bar of Texas. She has been admitted to practice before the Northern District of Texas. She was a member of the Law Review at Boston University and wrote an article for the Law Review on the Standards for Waiver of Fees in Actions under 42 U.S.C. § 1983.

Jordan's attorney is Molly Steele Bishop. She graduated with honors from the University of Texas School of Law in Austin, Texas, and then clerked for the Honorable Walter P. Gewin of the United States Court of Appeals for the Fifth Circuit, in Tuscaloosa, Alabama for one year. At that time she gained experience in handling Section 1983 cases. She has been practicing law in Dallas for four years and has tried approximately 35 cases during that period of time. Currently she handles a docket of approximately 100 cases, ranging from insurance defense work to large antitrust matters. She is admitted to practice before the Federal District Courts in Texas and the Fifth Circuit, and is a member of the American, Texas, and Dallas Bar Associations.

Each of these attorneys has had extensive trial experience and experience in handling prisoner related or criminal litigation. None of the attorneys had any prior professional relationship with their clients before being appointed to represent them.

Molly Steele Bishop spent approximately 250 hours in the trial and preparation of Robert Allen Jordan's civil rights action since her appointment in November of 1977. Tedford E. Kimbell has spent 17.5 hours in trial, and 36.75 hours in trial preparation on this case since his appointment. His associate Janet Babcock has spent 11.5 hours in trial of this case, and 161.75 hours in trial preparation in representing John Doescher. A law clerk has spent 1.5 hours working on Mr. Doescher's case. Vincent W. Perini and Elizabeth Unger Carlyle each spent ten hours in court representing Jack Rheuark. Attorney Perini expended 27.5 hours in trial preparation, briefing and other work pertaining to the case, and attorney Carlyle spent 246.8 hours in out of court preparation under Mr. Perini's general supervision. Law students worked on Rheuark's case for a total of 15.29 hours. Law clerks worked 13.31 hours which was equally divided between Plaintiffs Doescher and Jordan. A summary of the time records for each of these attorneys was introduced at a hearing the Court held on the question of attorney's

fees. None of the defendants seriously question the number of hours plaintiff's attorneys have spent in this case, and I find that all of these hours were reasonably incurred in the preparation and trial of this lawsuit.

There were no fixed fees in this case, because each of the Plaintiffs was proceeding in forma pauperis, and the only fees that counsel will recover will be from an award by this court. In that sense, the fee is contingent because if the Plaintiffs had lost, the attorneys would not have received any attorney's fees.

A number of attorneys, including the attorneys involved in this case, testified at the attorneys' fee hearing, and based upon that testimony, as well as the requested fees in this case, and a review of awards in similar cases [2] the Court concludes that it would be appropriate to award the attorneys the following fees for the work they performed for their clients in this case.

Vincent W. Perini—$80.00 per hour in court time, $70.00 per hour trial preparation.

Elizabeth Unger Carlyle—$57.00 per hour in court time, $50.00 per hour trial preparation; law student time, $30.00 per hour.

Tedford E. Kimbell—$80.00 per hour in court time, $70.00 per hour trial preparation; law student time $30 per hour.

Janet Babcock—$57.00 per hour in court time, $50.00 per hour trial preparation; law student time $30 per hour.

Molly Steele Bishop—$62.00 per hour trial preparation and in court time; law student time $30 per hour.

John T. Mitchell—$55.00 per hour appellate time representing Rheuark.

The main objective of this action was to establish the deprivation of the Plaintiffs' constitutional rights, and these rights cannot be priced in an exact dollar amount. Two of the Plaintiffs received an award of $1.00 in nominal damages, and the other Plaintiff received $3,000 in compensatory damages. However, the Court left open the possibility that Rheuark or Doescher might be awarded further compensatory damages at a later time.

■ The fact that Plaintiffs did not receive a large amount of money damages, however, should not control my award of attorneys' fees. I agree with the First Circuit in *Knight v. Auciello*, 453 F.2d 852 (1st Cir. 1972), when it concluded that although the violation of an important policy may involve little by way of actual damages, if a defendant can conclude that the financial circumstances of an injured party or the cost of litigation to any litigant is so substantial that the chances of suit being brought or continued in the face of opposition will be small, there will be little to hinder deliberate wrongdoing. "In such instances public policy may suggest an award of costs that will remove the burden from the shoulders of the Plaintiff seeking to vindicate the public right," *Id.* This is such a case, and if I were to award attorneys' fees based solely upon an hourly rate times the number of hours expended, I would award the hourly fees listed above times the number of hours requested by those attorneys.

■ However, *Johnson* requires that I take into consideration the undesirability of this case and the novelty and difficulty of the questions involved. As discussed by the witnesses at the hearing on attorneys' fees, this was an undesirable case for a number of reasons. Counsel were faced with representing prison inmates suing a respected criminal judge of the court in which the inmates had been convicted, as well as the judge's court reporter, the County Commissioners of the County of Dallas, and the county itself. One of the attorneys appointed by the court is actively involved in

---

**2.** The State of Texas was not named as a party to this litigation but "(a)lthough the 11th Amendment prevented . . . (the plaintiffs) . . . from suing the State by name, their injunctive suit . . . was, for all practical purposes, brought against the State".

*Hutto*, 437 U.S. at 699, 98 S.Ct. at 2578, 57 L.Ed.2d at 539. Thus, it is proper to award fees against the state. Further, the state represented some of the defendants at the hearings in this case and at the attorney's fee hearing.

a criminal practice, and has to appear before that criminal judge on a regular basis. In addition, all of the attorneys involved in this case are trial attorneys practicing before judges (and court reporters) in the state, county and federal courts in Dallas, and it is not very desirable to be known by court personnel as an attorney who has successfully sued a state judge and court reporter.

The court also heard extensive testimony that civil rights cases in general are undesirable cases for Plaintiff's attorneys, and that fewer and fewer attorneys in Dallas County are willing to assume the substantial risks involved in these cases given their small likelihood of success and the extraordinary amount of time it takes to pursue them. A number of attorneys testified that therefore they felt that an additional multiplier of up to 33% should be added to the court's fee award to encourage attorneys to take civil rights cases, especially those involving indigent prisoners.

This was a very complex case, which involved a number of difficult issues including questions of immunity, the right to speedy appeal, and jurisdiction. During the pendency of this case, the United States Supreme Court decided four cases which significantly affected the issues involved: *Monell v. New York City Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978); *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 538 (1978); and *Lake Country Estates v. Tahoe Regional Planning Agency*, 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979). The court is aware of no other case holding that the delay in the preparation of an indigent incarcerated defendant's statement of facts was unconstitutional and awarding damages therefor, and although many of the issues in this case were not ones of first impression, they were certainly very novel.

Finally, Jordan's attorney testified that she was precluded from taking on other employment because of the amount of the time she was spending in this case. Rheuark's attorney also testified that although he had not given up any other employment due to the appointment in this case, as a sole practitioner, accepting most clients who walked in through the door, he was forced to work longer hours than he would otherwise have had to do in order to accept this employment.

Taking all of the factors I have just discussed into consideration, I find that it is reasonable to assess a multiplier of 10% to the amount of attorney's fees awarded in this case. While not every civil rights case will merit an attorney's fee award in excess of that requested by counsel, the facts and circumstances of this case clearly justify such an additional award in a case where the chances of success were very remote. *See Wolf v. Frank*, 555 F.2d 1213 (5th Cir. 1977).

Therefore, I hereby award attorneys' fees and expenses in the following amounts, to be paid by the individual Defendants in their official capacities and by the County of Dallas:

| | |
|---|---|
| Plaintiff Rheuark's attorneys: (including law clerk work) | $17,082.34 attorneys fees |
| Plaintiff Doescher's attorneys: (including law clerk work) | $14,256.00 attorneys fees |
| | $ 358.59 expenses [3] |
| Plaintiff Jordan's attorney: (including law clerk work) | $17,269.45 attorneys fees |
| | $ 112.64 expenses [4] |
| John T. Mitchell: [5] | $ 1,270.50 attorneys fees |
| | $ 100.00 expenses |

It is so ORDERED.

---

3. This does not include $33.28 which was one-third of the expense for a shared law clerk. This amount is added in to the award of attorney's fees for each plaintiff, with 6.65 hours credited to each plaintiff at $33.00 per hour.

4. This does not include $33.28 which was one-third of the expense of a shared law clerk. This amount is added in to the award of attorney's fees for each plaintiff, with 6.65 hours credited to each plaintiff, at $33.00 per hour.

5. John T. Mitchell was appointed to represent Rheuark in this case when it was first appealed. He was successful in his efforts, and this Court's ruling was reversed by the Fifth Circuit. As attorney for the prevailing party on that part of this litigation he is entitled to an award of attorney's fees under § 1988.